IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BEVERLY R. JAMISON,

        Plaintiff,

        v.                           Civil Action No. 3:06-CV-39

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.    <u>Background</u>

    Plaintiff, Beverly R. Jamison, (Claimant), filed her Complaint on April 24, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on August

4, 2006.[2]  Claimant filed her Motion for Summary Judgment on February 26, 2007.[3]

Commissioner filed her Motion for Summary Judgment on March 8, 2007.[4]  Claimant filed a

Reply on March 14, 2007.[5]

B.    <u>The Pleadings</u>

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 14.

[4] Docket No. 15.

[5] Docket No. 16.

1.       <u>Claimant's Motion for Summary Judgment</u>.

2.       <u>Commissioner's Motion for Summary Judgment</u>.

C.     <u>Recommendation</u>

I recommend that:

1.       Claimant's Motion for Summary Judgment be DENIED.

2.       Commissioner's Motion for Summary Judgment be GRANTED. Although Claimant submitted new evidence, the Appeals Council incorporated the evidence into the record. The Court therefore reviews the entire administrative record. While the Appeals Council did not itself address the new evidence in a detailed manner, this does not automatically result in remand. Rather, the Court simply reviews the whole record, including the new evidence, to determine if substantial evidence exists. In this case, there is substantial evidence to support the ALJ, and the ALJ should therefore be affirmed.

## II. Facts

A.     <u>Procedural History</u>

Claimant filed an application for Social Security Disability Insurance Benefits on April 29, 2004, alleging disability since March 14, 2004. The application was denied initially and on reconsideration. Claimant requested a hearing before an ALJ and received a hearing on September 21, 2005. On November 4, 2005, the ALJ issued a decision adverse to Claimant. Claimant requested review by the Appeals Council, but it denied this request. Claimant filed this action, which proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 53 years old on the date of the September 21, 2005 hearing before the ALJ.

Claimant has a GED education. Claimant has prior work experience as a certified emergency medical technician.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: March 14, 2004 – November 4, 2005.[6]

**Frederick H. Armbrust, M.D., 3/14/04, Tr. 109**
Impression: acute compression fracture of L1.

**John H. Schmidt, M.D., 3/22/04, Tr. 112**
Pre-operative diagnosis: the patient has a L1 compression fracture after a vehicle accident. The patient had severe pain and an approximately fifty percent compression fracture of L1 with spinal canal narrowing in the AP dimension.

**Frederick H. Armbrust, M.D., 3/14/04, Tr. 115**
Impression: burst fracture of L1 with retropulsion of bone without neurologic deficits.

**John A. DeLuca, M.D., 3/22/04, Tr. 117**
Pre-operative diagnosis: L1 compression fracture with retropulsion

Post-operative diagnosis: L1 compression fracture with retropulsion

**John H. Schmidt, M.D., 3/22/04, Tr. 120**
Pre-operative diagnosis: the patient has a L1 compression fracture after a vehicle accident. The patient had severe pain and an approximately fifty percent compression fracture of L1 with spinal canal narrowing in the AP dimension.

**John A. DeLuca, M.D., 3/22/04, Tr. 124**
Pre-operative diagnosis: L1 compression fracture with retropulsion

Post-operative diagnosis: L1 compression fracture with retropulsion

_____

[6] Much of the evidence in the record comes from before Claimant's alleged onset date of disability. Commissioner asserts this evidence is relevant "for background purposes only." Def.'s Br. at 2. Evidence obtained prior to the alleged onset date may be relevant to the instant claim. See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004).

**John H. Schmidt, M.D., 3/22/04, Tr. 127**
Pre-operative diagnosis: the patient has a L1 compression fracture after a vehicle accident. The patient had severe pain and an approximately fifty percent compression fracture of L1 with spinal canal narrowing in the AP dimension.

**Frederick H. Armbrust, M.D., 3/19/04, Tr. 130**
Impression: complex compression fracture of L1 consistent with an unstable type fracture

**John A. DeLuca, M.D., 3/22/04, Tr. 131**
Pre-operative diagnosis: L1 compression fracture with retropulsion

Post-operative diagnosis: L1 compression fracture with retropulsion

**John H. Schmidt, M.D., 3/22/04, Tr. 133**
Pre-operative diagnosis: the patient has a L1 compression fracture after a vehicle accident. The patient had severe pain and an approximately fifty percent compression fracture of L1 with spinal canal narrowing in the AP dimension.

**Frederick H. Armbrust, M.D., 3/14/04, Tr. 139, 141**
Impression: burst fracture of L1 with retropulsion of bone without neurologic deficits

**Mario Balmaseda, M.D., 3/30/04, Tr. 142**
Diagnosis on admission: diminished functional status secondary to severe back pain, status post anterior L1 corpectomy infusion with cage stabilization for L1 burst fracture

**Frederick H. Armbrust, M.D., 3/14/04, Tr. 145**
Impression: burst fracture of L1 with retropulsion of bone without neurologic deficits

**John A. DeLuca, M.D., 3/22/04, Tr. 147**
Pre-operative diagnosis: L1 compression fracture with retropulsion

Post-operative diagnosis: L1 compression fracture with retropulsion

**John H. Schmidt, M.D., 3/22/04, Tr. 150**
Pre-operative diagnosis: the patient has a L1 compression fracture after a vehicle accident. The patient had severe pain and an approximately fifty percent compression fracture of L1 with spinal canal narrowing in the AP dimension.

**Brendan L. O'Hara, M.D., 3/15/04, Tr. 153**
Diagnosis: compression fracture at L1, acute

**Frederick H. Armbrust, M.D., 3/14/04, Tr. 155**
Impression: acute compression fracture of L1

**Frederick H. Armbrust, M.D., 3/14/04, Tr. 160**
Impression: burst fracture of L1 with retropulsion of bone without neurologic deficits

**Brendan O'Hara, M.D., 3/14/04, Tr. 163**
Impression: compression fracture of L1

**Brendan O'Hara, M.D., 3/14/04, Tr. 164**
Impression: L1 fracture with posterior retropulsion of bone into the spinal canal, measuring 8.0 mm posteriorly

**Stephen Hass, M.D., 3/15/04, Tr. 168**
Impression: moderate to severe compression deformity at L1. This has been previously evaluated with a CT scan of the lumbar spine.

**John Kuruvilla, M.D., 3/15/04, Tr. 169**
Impression: bibasilar pulmonary infiltrates, hiatal hernia, fatty change of the liver, fracture at the dorsolumbar junction of the spine

**Frederick Armbrust, M.D., 3/19/04, Tr. 170**
Impression: complex compression fracture of L1 consistent with an unstable type fracture

**John Schmidt, M.D., 3/22/04, Tr. 171**
Impression: retained contrast throughout the entire colon which obscures visualization of the abdomen and lumbar spine., postoperative changes in the region extending from the T12 vertebral bodies down to the region of the L2 vertebral bodies, collection of air noted in the right upper quadrant of the abdomen with unknown significance. The final point may represent free air within the abdomen

**Frederick Armbrust, M.D., 3/24/04, Tr. 173**
Impression: slight interval development of haziness about the left lung base most likely atelectasis and a small amount of pleural fluid. No pneumothorax is evident. Metallic hardware projects in the vicinity of the thoracolumbar spine

**Stephen Hass, M.D., 3/25/04, Tr. 174**
There is a left sided chest tube and a right sided central line in place. There is a large left pleural effusion. There is an infiltrate or atelectasis at the right base. A definite pneumothorax is not seen. The heart projects as upper limits of normal to slightly enlarged

**J. Jackson, M.D., 3/26/04, Tr. 175**
Impression: left sided chest tube removal

**John Schmidt, M.D., 3/29/04, Tr. 176**
Atelectasis persists involving the entire left lower lobe. There is a slight decrease in the amount of pleural fluid on the left. The central line has been removed and the atelectatic changes in the

right lower lung zone have cleared.  In sum, there is internal improvement with persistent atelectasis involving the lower left lobe

**Frederick Armbrust, M.D., 3/14/04, Tr. 178**
Diagnostics: diagnostics of the L-spine shows compression fracture of L1

**Mario Balmaseda, M.D., 4/7/04, Tr. 179**
Discharge diagnoses: diminished conscious status secondary to severe back pain, status post anterior L1 corpectomy and fusion with cage stabilization for an L1 rib fracture

**Mario Balmaseda, M.D., 3/30/04, Tr. 181**
Diagnosis on admission: diminished functional status secondary to severe back pain, status post anterior L1 corpectomy infusion with cage stabilization for L1 burst fracture

**Frederick Armbrust, M.D., 4/20/04, Tr. 189**
Admission diagnosis: L1 compression fracture

**Frederick Armbrust, M.D., 3/14/04, Tr. 190**
Diagnostics: compression fracture of L1

Impression: acute compression fracture of L1

**Frederick Armbrust, M.D., 3/14/04, Tr. 192**
Impression: burst fracture of L1 with retropulsion of bone without neurologic deficits

**John DeLuca, M.D., 3/22/04, Tr. 200**
Pre-operative diagnosis: L1 compression fracture with retropulsion

Post-operative diagnosis: L1 compression fracture with retropulsion

**John Schmidt, M.D., 3/22/04, Tr. 202**
Pre-operative diagnosis: there is an L1 compression fracture due to a motor vehicle accident. The patient was experiencing severe pain and approximately fifty percent compression fracture of L1 and fifty percent spinal canal narrowing in the AP dimension.

**Brendan O'Hara, M.D., 3/14/04, Tr. 206**
Impression: compression fracture of L1

**Brendan O'Hara, M.D., 3/14/04, Tr. 207**
There is an L1 fracture with posterior retropulsion of bone into the spinal canal, measuring 8 mm posteriorly.  The fracture involves each pedicle and extends to the base of the spinous process. There is a small paraspinal hematoma

**Stephen Hass, M.D., 3/15/04, Tr. 211**

Impression: moderate to severe compression deformity at L1. This has been previously evaluated with a CT scan. There are retriopulsed fragments.

### John Kuruvilla, M.D., 3/15/04, Tr. 212
Impression: bibasilar pulmonary infiltrates, hiatal hernia, fatty change of the liver, fracture at the dorsolumbar junction of the spine.

### Frederick Armbrust, M.D., 3/19/04, Tr. 213
There is a complex compression fracture of L1 consistent with an unstable type fracture. There is a displaced fracture fragment anteriorly. This fracture clearly involves the anterior column and likely the middle column and possibly the posterior column.

### John Schmidt, M.D., 3/22/04, Tr. 214
Impression: retained contrast throughout the entire colon which obscures visualization of the abdomen and lumbar spine, postoperative changes in the region extending from the T12 vertebral bodies down to the region of the L2 vertebral bodies, collection of air noted in the right upper quadrant of the abdomen with unknown significance. This latter point may represent free air within the abdomen.

### Frederick Armbrust, M.D., 3/24/04, Tr. 216
Impression: slight interval development of haziness about the left lung base most likely atelectasis and a small amount of pleural fluid. No pneumothorax is evident. Metallic hardware projects in the vicinity of the thoracolumbar spine.

### Stephen Hass, M.D., 3/25/04, Tr. 217
There is a left sided chest tube and a right sided central line in place. There is a large left sided pleural effusion. There is an infiltrate or atelectasis at the right base. A definite pneumothorax is not seen. The heart projects as upper limits of normal to slightly enlarged.

### J. Jackson, M.D., 3/26/04, Tr. 218
Impression: left sided chest tube removal

### John Schmidt, M.D., 3/29/04, Tr. 219
There is interval improvement with persistent atelectasis involving the left lower lobe. Atelectasis persists involving the entire left lower lobe. There has been a slight decrease in the amount of associated pleural fluid on the left. The central line has been removed and the atelectatic changes in the right lower lung zone have cleared.

### John DeLuca, M.D., 3/22/04, Tr. 220
Impression: infiltrate with atelectatic changes in the right lower lung, chest tube extending from the lower left hemithorax into the mid thoracic region.

### John Schmidt, M.D., 3/22/04, Tr. 221
Impression: postoperative changes extending from T12 to L2.

**Arturo Sabio, M.D., 7/13/04, Tr. 230**
Diagnostic impression: burst fracture of the first lumbar vertebra with severe back pain, L1 corpectomy and cage stablilization, status post bone fusion

**Physical Residual Functional Capacity Assessment, 7/14/04, Tr. 235**
Exertional limitations
      Occasionally lift and/or carry 50 pounds
      Frequently lift and/or carry 25 pounds
      Stand and/or walk about 6 hours in an 8 hour work day
      Sit for a total of about 6 hours in an 8 hour work day
      Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**John Schmidt, M.D., 9/2/04, Tr. 255**
Impression: there postoperative changes T12-L2 without significant change from the prior evaluation.

**John Schmidt, M.D., 9/2/04, Tr. 260**
Impression: there postoperative changes T12-L2 without significant change from the prior evaluation.

**Physical Residual Functional Capacity Assessment, 9/17/04, Tr. 265**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour work day
      Sit for a total of about 6 hours in an 8 hour work day
      Push and/or pull: unlimited

Postural limitations
      Climbing ramps/stairs, balancing, stooping, kneeling, crouching, crawling: occasionally
      Climbing ladders/ropes/scaffolds: never

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
      Hazards: avoid even moderate exposure

**Jack S. Koay, M.D., 10/7/04, Tr. 273**
Impression: status post lateral L1 corpectomy, T12-L2 fixation/fusion with titanium vertespan cage and screws with autograft.

Prognosis: neurologically it is stable at the moment. The claimant will likely not be able to return to her pre-injury work.

**John Schmidt, M.D., 10/22/04, Tr. 285**
Impression: the claimant is neurologically stable after a corpectomy fixation/fusion.

**John Schmidt, M.D., 10/4/04, Tr. 286**
There is a cage with fixating bars traversing T12 to L2. There is some limitation of flexion.

**Jack S. Koay, M.D., 4/27/05, Tr. 291**
Impression: status post anterolateral L1 corpectomy, T12-L2 fixation/fusion with titanium vertespan cage and screws with autograft

Prognosis: neurologically stable at this moment on the thoracic and lumbar spine. The claimant will probably not be able to return to her former work.

**Arthur J. Smith, P.T., 12/13/05, Tr. 308**
Non-material handling activities
     Reaching forward: frequently
     Sitting, standing/walking, reaching overhead, squatting, crawling, arm and leg controls: occasionally
     Bending: minimally
     Kneeling, crawling, climbing: never

D.    Testimonial Evidence

     Testimony was taken at the September 21, 2005 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

     Q     Okay. Do you have a driver's license?

     A     Yes, I do.

     Q     Did you drive to the hearing in Bridgeport today?

     A     That is correct.

Q       How long did it take you to get from Gilmer County to the hearing today?

A       A little over an hour.  It's 54 miles one way.

Q       How much do you drive normally, Ms. Jamison?

A       Lately, not a lot.

Q       How come?

A       Sir?

Q       How come?

A       I go when I need to go.  Sitting too long  bothers  me, it makes me stiff.   Doesn't have to be very long.

Q       All right.  Do you smoke?

A       No.

Q       Do you drink at all?

A       No.

                              *                   *                   *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q       Let's talk about the consequence of this accident.  What limitations does it impose upon you?  Are there any limitations?

A       Oh, yeah.  There's limitations.  A lot of limitations.

Q       Let's talk about limitations with respect to - - any limitations with respect to walking?

A       I can walk.  I limp sometimes, but I walk.

Q       What about sitting?

A        Sitting, I sit, but I don't sit for long periods of time.  I'm up and down because of the pain.  I don't - - I'm on my feet for an amount of time, then I have to sit down, so I'm limited in between sitting and standing.  And do you want more?

Q        Well, this is your hearing, this is your time to talk.

A        All right.  When I try to bend down, I have to use my hands to get up because of the numbness that's still in my side.  I have numbness from here all the way back to mid-back.

Q        You're talking about your left side.

A        My left side, down my leg to my knee area and down a little bit low.  My strength is just not enough to get up and down.  I do try to work out on a Gazelle (phonetic), which keeps my body in a straight line, but I'm limited on that - -

ALJ        What's a Gazelle?

CLMT        A Gazelle, it's - -

ALJ        What's a Gazelle?

CLMT        A Gazelle is like an exercise thing that you stand on.  You don't really move.  You just kind of move your hands, and it moves your lower half, just the leg area, keeps you in a straight line, just kind of working the muscles to try to get strength.

ALJ        Okay.  Nothing like a treadmill.

CLMT        It's similar, but no.

ALJ        But you don't move your feet.

CLMT        No.

ALJ        Okay, go ahead.

BY ATTORNEY:

Q      Okay.  Now any sleep problems?

A      Yes.

Q      Tell us about those.

A      I can only sleep a limited amount.  I sleep, and I wake up.  Due to pain, I'll try to roll  to my side.  On my left side is not very long a time, but it'll give me relief off of my back, and then I'll have to roll back on my back, and then after that I'll have to roll to the right side. Neither side lets me stay long because of the pain, and I roll back on my back.  I'm up and down two or three times during the night or maybe more.

Q      How much sleep do you get on the average each evening?

A      I never really check.  I don't go to bed until about - - I go to bed around 9.  I don't keep track of how long I sleep, but it's always a restless sleep, it's never a full night's sleep.

Q      Okay.  How long can you sit comfortably?

A      Comfortably?  Maybe a half hour, 45 minutes at the most.

Q      At one time?

A      At one time.

Q      Then what do you have to do?

A      I get up, I walk around, I try to just - - I do a lot of walking, I do a lot of walking, just walking.

Q      In terms of lifting, does this - -

A      Ten pounds.

Q      - - accident impair your ability to lift?

A      I'm allowed 10 pounds lifting.

Q       Who allowed you 10 pounds?

A       The doctor.  Says 10 pounds is the limit.

Q       Well, have you tried to lift anything heavier?

A       No, 'cause - - it just - - I don't want to 'cause I'm in a lot of pain now.  Why would I want to add to it?  I'm sorry.

Q       Have you done anything, any activity that affected the pain in any way?

A       To make it easier or harder?

Q       Either one.  that's why I phrased it that way.

A       Everything I try to keep at a mid-level.  If I have to bend down, I have a stick I use to pull stuff up to me.  I don't really bend a whole lot.  I can squat for some degree, but my knees are getting to the point they hurt a lot.  So I do - - I squat like only part way, not all the way down because I can't get back up unless I use my hands.  And I never get anywhere that I can't use my hands to get back up.

Q       So that - - using assistance to get up is something that you usually have to do?

A       Yes.

Q       Okay.  Now how would you describe your energy level.?

A       It's not bad.  It's not like it used to be, but certainly not drastic.  I mean I get up and I do - - I do light chores around the house because it keeps me busy.  I do like stuff I do from the level that I can reach.  My dad will bend down and get stuff for me if it's lower level.

Q       Who was that again?

A       My father will get stuff on lower levels that I can't get.

Q        Do you do dishes?

A        I do dishes.

Q        What about laundry?

A        Laundry, I do.

Q        Any activity in particular around the house that you can't do because of this problem with your back?

A        I can sweep as long as I can take two rooms at a time.  I don't mop.  It's too much stress.  I can't do the back and forward motion.  It's too hard for me.  I do sweep and I'll take my time with that.  I can - - long as I don't have to bend down too low.  If something has to be gotten under, somebody else - -

Q        Bending's a problem.

A        Bending's a problem.

Q        How about climbing stairs?

A        I can go up and down stairs as long as they're not - - if there are too many stairs, I take my time and go part-way, stop and - -

Q        Can you go upstairs or downstairs without hand railing, use of - -

A        No, not without hand railings.  I wouldn't go.  It's - - no, I have a handrail.

Q        Now the pain that we're describing, where is it located?

A        Pain is right here, right here, all the way around - -

Q        You're talking about low back?

A        Below here, my side.  I can feel it when I touch it.

Q        It's hard to describe - -

A       It's sensitive.

Q       - - but in these cases, I ask people to do as best they can, whether it's a dull ache or a sharp stinging pain, what description you would best give it to be.

A       If you know what it's like to have an arm that you sleep on when it's waking up, it's that tingling numb irritating burning - - but it doesn't go away.  It's not - - it doesn't wake up.  It's just - - the doctor said it may or may not - - the nerves may or may not heal up all the way because they had to pull that main nerve really taught.  When they were doing the surgery, he was explaining that in the ones that they cut, between those nerves is just not healed up yet, and it may take time.  I don't know how  much time.  He didn't say.  He said it may not.

Q       Does your discomfort, is it the same all the time, or does it get better or worse?

A       Pretty much it's same all the time.  Once in a while, if the weather is good, right now it's very irritating, if the - -

Q       When the weather's good?

A       If the weather is good, it feels a little bit better, but it's still thee, and you can't miss it.

Q       Do you have any days where it's worse than other days?

A       Oh, yeah.

Q       You said it - -

A       Rainy days and in the cold weather.  The cold weather and rainy days.

Q       That affects you the most.

A       Yes.

Q       Ever have problems standing at one place in one - -

A       Well I don't stand in one place.   I just kind of like move around.  I don't stand in one place very long at all.  It's uncomfortable.

Q       Are you aware of your pain at all times?

A       Yes, I am.  Yes, I am.

Q       Okay.

A       But I don't like taking medications for pain because I like to be alert for my thinking, and it's like the doctor said, you need to make sure that your movements, you are aware of your movements so that you don't slip and fall or do something that's going to cause you to be paralyzed for life, because - -

Q       Okay.  Has this injury affected your ability to concentrate at all or to pay attention?

A       Sometimes.

Q       Sometimes.  Like what?

A       When I get in the most pain, when I get like now, starting to feel pain a lot, I'll get up so I won't lose that concentration because I'll be more aware of the pain than I am of what someone's talking to me about.

Q       Is there - - have you ever had a situation where you've gotten involved in something that you forgot about your pain, you didn't notice you had any pain?

A       No.  I would like to. No.

Q       Well, how's your emotional health holding up?

A       Right now?

Q       Yeah.

A  Now that I'm being more aware of the things I can't do, I'm hanging in there but it irritates me.

Q  You've pretty much taken care of yourself all of your life. Is that right?

A  Yes. This is hard.

Q  You've enjoyed the fact that you've been independent, been able to take care of yourself. Is that right?

A  Yup.

Q  And that's not - - that's not happening right now, is it? And you don't like being around with your parents, to have them help you, do you?

A  Nope.

Q  Do you think you have - - what kind of plans do you have for the future?

A  Don't know yet. I've just got to get up a minute.

Q  Have you thought about your future?

A  I've been trying. I just hadn't figured out what I was going to do yet.

Q  Do you think you can work now?

A  (INAUDIBLE).

Q  Why not?

A  Due to the pain, I don't think I'd get through a whole eight- hour day, not in the real work anyway.

ATTY  That's all.

BY ADMINISTRATIVE LAW JUDGE:

Q  Let me talk about your pain, Ms. Jamison. You said - - the thought occurs that

you don't have medical coverage for medication, makes me think that you needed it but then - - are you saying now that you wouldn't take it because you don't like to take it anyway?

A That's correct.

Q Or is it a little of both? Which one's correct?

A I don't like taking pain medication, and I worry about the fact that how - - all this stuff about pain medication affects the brain. It keeps you from thinking, and I don't like to be kept from thinking. Like you said, I've always been independent all my life. I'm an independent person.

Q Did you live alone before the accident?

A Yes. I had a house, and I sold it to my niece and nephew, Steven Jamison. I had to sell it because I couldn't afford it, much less my bills I had - -

*   *   *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q Sir, how would you describe Ms. Jamison's past work as an EMT?

A Exertional level for the DOT, Your Honor, is medium, skill level is skilled.

Q Does that job, Mr. Ganoe, in part, transferable skills?

A No, I do not think it does, Your Honor.

Q Assume an individual approaching advanced age with a GED, precluded from performing all but light work with a sit-stand option, with no repetitive bending, no hazards and no climbing. With those limitations - - and no temperature extremes. With those limitations, can you describe any work this hypothetical individual can perform?

A Under the light exertional level, Your Honor, a mail clerk, it's a clerical type

18

position, 202,000 nationally, 2,300 regionally.  An assembler type position, 1.7 million nationally, 18,000 regionally.  A toll collector, 150,000 nationally, 400 regionally.

Q       Are those jobs consistent with the DOT?

A       They are, Your Honor, except the DOT doesn't describe whether or not a job has a sit-stand option.  That's based upon my experiencing in placing individuals in their repetitive position.

Q       Mr. Ganoe, if the Claimant's pain was so severe that she could not stay on task one-third, two-thirds of the day, are those jobs (INAUDIBLE)?

A       Yes, Your Honor.  Those jobs would be eliminated, as would all other jobs be eliminated.

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•       Washes and dresses herself (Tr. 82)

•       Prepares food such as eggs, bacon, grits, toast, sandwiches, and other full course meals (Tr. 82)

•       Does cleaning activities such as cleaning laundry, dusting furniture, and washing dishes (Tr. 82, 327)

•       Pays bills and manages bank accounts (Tr. 82)

•       Shops for food and clothing (Tr. 83)

•       Reads newspapers and books (Tr. 83)

- Watches television and listens to the radio (Tr. 83)

- Has hobbies such as painting, swimming, fishing, gardening, walking, and going to church (Tr. 84)

- Receives visits from relatives (Tr. 84)

- Has a driver's license and is able to drive a car (Tr. 319)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence.  The Court has construed Claimant's brief to present two arguments of error.  Claimant contends the Appeals Council erred by failing to analyze the significance of this evidence, instead making a simple form rejection of Claimant's appeal.  Second, Claimant argues that when the record is evaluated in light of the new functional capacity evaluation procured after the administrative hearing, substantial evidence does not support the ALJ's decision.

Commissioner contends the ALJ's decision has substantial evidence to support it and so should be affirmed.  Commissioner argues the new physical functional assessment obtained by Claimant after the administrative hearing is not significant.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party

opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587

(1986).  However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242,

256 (1986).

      2.     <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive

judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir.

1986).

      3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national

economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

      4.     <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S.</u>

<u>Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

      5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.     Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

I.

Whether the Appeals Council Erred in Not Fully Evaluating the New Evaluation of Claimant

Claimant contends the Appeals Council erred in not fully considering the additional evaluation submitted to it. Claimant contends the standard form denial of review issued by the Appeals Council was error.

The Regulations provide that where new and material evidence is submitted to the Appeals Council and the evidence relates to the time on or before when the ALJ made his decision, the Appeals Council must "evaluate the entire record including the new and material evidence." 20 C.F.R. § 404.970(b). This does not mean the Appeals Council must grant review. Id. Rather, it "will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of evidence currently of record." Id. In Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95 (4th Cir. 1991), the court held that while this Regulation imposes a mandatory duty for the Appeals Council to consider new and material evidence, the Appeals Council may still decline to review the case. Furthermore, where new and material evidence is submitted and the Appeals Council nevertheless declines review, a reviewing court should simply consider the entire administrative record, including the new material evidence, to determine whether substantial evidence supports the ALJ's decision. Id. at

96.  <u>Wilkins</u> did not expressly address the depth of consideration the Appeals Council had to give to new and material evidence submitted to it.  <u>Id.</u> at 95-96.

In <u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir. 1992), the Eighth Circuit held it was not necessary for the Appeals Council to conduct an independent review of evidence submitted to it.  The court noted the governing statute provides only for review of the final administrative decision, but when the Appeals Council denies review the decision of the ALJ is the final decision.  <u>Id.</u>  Therefore, the court concluded it lacked jurisdiction to review the decision of the Appeals Council.  <u>Id.</u>

The Fourth Circuit has given conflicting precedent in unpublished opinions regarding the review the Appeals Council must give to newly submitted evidence.  The court explicitly endorsed the reasoning of <u>Browning</u> in <u>Hollar v. Comm'r of the Social Sec. Admin.</u>, 1999 U.S. App. LEXIS 23121, at *3 (4th Cir.) (holding that "We agree with [<u>Browning</u>]").  The court again seemed to endorse <u>Browning</u> in <u>Freeman v. Halter</u>, 15 Fed. Appx. 87, 89 (4th Cir. 2001).  However, in <u>Thomas</u>, 24 Fed. Appx. at 162, the Fourth Circuit held a bare explanation by the Appeals Council that it rejected additional evidence was insufficient.  In <u>Thomas</u>, the claimant submitted additional evidence from a treating physician who conducted an examination after the administrative hearing.  <u>Id.</u>  The Appeals Council summarily denied review, noting it found nothing significant about the new evidence.  <u>Id.</u>  However, the record was unclear that the doctor was a treating physician until oral argument on appeal.  <u>Id.</u>  The court found itself unable to review the administrative decision without clarification that the Appeals Council knew the doctor was a treating physician.  <u>Id.</u>  The court determined clarification on this point was especially important because of the significance of the treating physician rule, which requires the

opinions of treating physicians be given great weight.  Id. (citing Hunter v. Sullivan, 993 F.2d

31, 35 (4th Cir. 1992) and Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987)).  The court

ordered the case remanded.  Id.

A published Fourth Circuit opinion is ambiguous on the need of the Appeals Council to

consider newly submitted evidence.  In Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980), the

claimant submitted a new psychiatric report and a new chiropractic report to the Appeals

Council.  The Appeals Council noted it received the items, but did not elaborate.  Id.  The Fourth

Circuit noted the chiropractic report was largely duplicative of other evidence and so did not

need to be considered.  Id.  On the other hand, the psychiatric report presented new and material

evidence and so should have been the subject of detailed findings.  Id.  The court found the

failure to make specific findings a basis for remand.  Id.

Lower courts within the Fourth Circuit have also given conflicting precedent on this

issue.  In King v. Barnhart, 415 F. Supp. 2d 607, 610-12 (E.D.N.C. 2005), the court held that

where new evidence is submitted to the Appeals Council and the Appeals Council does not make

an independent evaluation, the proper course is to simply evaluate the record as a whole,

including the new evidence, to determine whether there is substantial evidence to support the

administrative decision.  The court reached this conclusion after a detailed evaluation of Fourth

Circuit precedent.  Id.  It concluded from that precedent that where the new evidence does not

undermine the administrative decision, the Fourth Circuit affirms, but where the new evidence

does make substantial evidence lacking, it remands for further consideration.  Id.  Another court

agreed with the Browning decision in Jackson v. Barnhart, 368 F. Supp. 2d 504, 508 n. 2 (D.S.C.

2005).  The court noted the new evidence submitted contradicted the record.  Id.  On the other

hand, some courts have held that where the Appeals Council incorporates new evidence into the record, the absence of an explanation of the weight given to the evidence necessitates remand since it is the function of the administrative adjudicators to weigh the evidence. Scott v. Barnhart, 332 F. Supp. 2d 869, 877-79 (D. Md. 2004); Harmon v. Apfel, 103 F. Supp. 869, 872-74 (D.S.C. 2000); Riley v. Apfel, 88 F. Supp. 2d 572, 579-80 (W.D. Va. 2000).

This Court is persuaded the King court has properly viewed the issue in accord with Fourth Circuit precedent and that where the Appeals Council incorporates new evidence into the record but does not make specific findings regarding it, a reviewing court should simply weigh all the evidence to determine if substantial evidence exists. First, this approach accords with the Fourth Circuit's published precedent of Myers. The court there found no fault in the Appeals Council not evaluating cumulative evidence, but ordered remand where there was no explanation concerning new and material evidence. Myers, 611 F.2d at 983. The new and material evidence not evaluated by Commissioner meant the decision lacked substantial evidence. This approach also reconciles the Thomas and Hollar decisions. The Thomas court there was careful to point out the special significance of the how the treating physician rule meant the new evidence undermined confidence in the administrative decision. Thomas, 24 Fed. Appx. at 162. On the other hand, when the Hollar court made a broad statement that the Appeals Council is not required to analyze new evidence, there was no evidence in the opinion that the new evidence would have changed the outcome. Hollar, 1999 U.S. App. LEXIS 23121, at *3.

In this case, the Appeals Council's opinion referenced evidence in an enclosed order. (Tr. 10). Enclosed with the opinion was an order making the new report part of the record. (Tr. 13). Thus, it is obvious the Appeals Council considered the evidence, but did not give any

explanation as to the weight accorded to it. Under the law as explained above, the Court must now determine whether substantial evidence exists to support the ALJ's decision in spite of the new report. This is the same question the Court has identified as Claimant's second argument of error. Therefore, this question will be discussed in section II of this opinion. For the reasons that follow, the Court concludes substantial evidence exists and so the ALJ should be affirmed.

II.

Whether Substantial Evidence Exists When the Record Is Evaluated in Light of Claimant's New Evidence

Claimant finally argues that when the record is considered in light of the new evidence from a physical therapist she submitted, substantial evidence does not exist to support Commissioner's decision. Commissioner contends the physical therapist's opinion is entitled to little weight under the Regulations. Commissioner further contends the physical therapist's opinion is inconsistent with the record. In accord with the Court's decision above, the Court will evaluate the entire record, including the new evidence, to determine whether substantial evidence exists. King, 415 F. Supp. 2d at 610-12.

The ALJ assigned Claimant a residual functional capacity allowing her to perform light work under some limitations. (Tr. 25). The ALJ determined Claimant required a sit/stand option and must work in a controlled environment. (Id.). She could not be around extreme temperatures, engage in repetitive bending, or be exposed to hazards. (Id.).

The Court believes substantial evidence supports the ALJ's decision. Claimant underwent significant surgery in March 2004 in response to a compression fracture. (Tr. 112-14, 147-49). In May 2004, she was found to have 5/5 strength in her upper and lower body. (Tr. 137). She was noted to be caring for herself, ambulating without a brace, and to have good

27

control of her bowels and bladder.  (Id.).  Claimant experienced occasional pain and numbness in her groin.  (Id.).  In September 2004, it was noted that while Claimant had "a degree of emerging back pain," she also had great alignment of the spine and "no new weakness, tingling, or numbness in the extremities or any new problem with bowel or bladder control."  (Tr. 252).  In April 2005, Claimant was noted to have some chronic dorsal back pain.  (Tr. 289).  Claimant denied new weakness, tingling, or numbess or any new problems with bladder or bowel control. (Id.).  It was stated Claimant believed she was otherwise in good health.  (Id.).

The ALJ also correctly noted Claimant's daily activities are inconsistent with the disability alleged.  (Tr. 24-25).  Evidence of daily activities are relevant in determining disability.  Hunter, 993 F.2d at 35.  Although Claimant made significant complaints regarding pain at the administrative hearing, she does not take any pain medication besides aspirin.  (Tr. 285, 324-25, 328-32).  Claimant has a driver's license and was able to drive a car slightly over an hour to the administrative hearing.  (Tr. 25, 319).  Claimant can wash dishes and do laundry. (Tr. 24, 82, 327).  She walks with a normal gait and without a limp.  (Tr. 278).  Claimant does not wear a brace and does not use a cane or crutches.  (Tr. 275).  She used a bone stimulator after her surgery, but ended this treatment in October 2004.  (Id.).  In two examinations with Dr. Koay conducted in October 2004 and April 2005, Claimant was able to walk around the examination room and mount and dismount the examination table.  (Tr. 278, 296).

The opinions of consulting physicians further support that the Claimant retains the capacity to work.  A physical residual functional capacity assessment completed in July 2004 found Claimant to have only minor exertional limitations and no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 236-39).  Another physical residual

functional capacity assessment found Claimant could frequently lift ten pounds, occasionally lift twenty pounds, and stand and sit for six hours in a work day. (Tr. 266). It found Claimant could only perform most postural movements occasionally, had no manipulative or visual limitations, and should avoid hazards. (Tr. 267-69).

Since Claimant places great weight on the new physical therapist report, the Court takes time to evaluate its significance. The Regulations provide a list of sources who can be used to establish a medically determinable impairment for purposes of disability. 20 C.F.R. § 404.1513(a). Physical therapists are not included within this list. Id.; see also Yost v. Barnhart, 79 Fed. Appx. 553, 555 (4th Cir. 2003) (finding physical therapists are not acceptable sources under the Regulations). The Regulations classify physical therapists as one of "other sources" that may be used in addition to acceptable medical sources. 20 C.F.R. § 404.1513(d)(1). The opinions of "other sources" "are entitled to significantly less weight" than acceptable medical sources. Craig, 76 F.3d at 590. In Howell v. Barnhart, 2006 U.S. Dist. LEXIS 5517, at *14 (W.D. Va.), the court determined that an evaluation by a physical therapist was "not likely to change the Commissioner's decision, as a physical therapist is not considered an acceptable medical source who can provide evidence as to an impairment."

The new evidence Claimant proffered to the Appeals Council was a report prepared by physical therapist Arthur Smith, Jr., P.T., in December 2005. Claimant's brief appears to indicate this was the first time she had seen Smith. Pl.'s Br. at 8. Smith's evaluation concluded Claimant could only sit, stand, walk, reach (overhead), squat, climb (stairs), and use arm and leg controls occasionally. (Tr. 309). She could never kneel, crawl, or climb ladders. (Id.). She could frequently reach forward and bend a minimal amount. (Id.). Smith determined Claimant

could only perform sedentary work on a part time basis. (Tr. 310). Smith specifically found this to be the case by Department of Labor standards. (Id.).

The new report qualifies as an "other source" under the Regulations. 20 C.F.R. § 404.1513(d)(1); (Tr. 308-11). The report is signed by Arthur Smith, Jr., P.T. (Tr. 311). Since Smith is a physical therapist, he is an "other source" whose opinion is given much less weight than an acceptable medical source. Craig, 76 F.3d at 590. It is true that Claimant's new evidence provides support for her case. Yet the evidence evaluated above easily provides the ALJ's opinion substantial evidence so that this Court should affirm.

Finally, it is quite telling that Claimant's brief appears to concede the ALJ's decision should be affirmed based on the evidence presented to the ALJ. Claimant's brief states she "concedes [that while] she may disagree with the decision [of the ALJ], based upon the record before the Administrative Law Judge she is not disabled [and] an appeal to the Appeals Council based upon mere disagreement would be weak." Pl.'s Br. at 8. An addition of evidence from an "other source" is highly unlikely to change the outcome of an otherwise valid decision. 20 C.F.R. § 404.1513(d)(1); Howell, 2006 U.S. Dist. LEXIS 5517, at *14.

Thus, the Court finds the ALJ's opinion to have substantial evidence to support it. Therefore, the ALJ should be affirmed. Hays, 907 F.2d at 1456.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be DENIED.

2.     Commissioner's Motion for Summary Judgment be GRANTED. Although Claimant submitted new evidence, the Appeals Council incorporated the evidence into the

record.  The Court therefore reviews the entire administrative record.  While the Appeals Council did not itself address the new evidence in a detailed manner, this does not automatically result in remand.  Rather, the Court simply reviews the whole record, including the new evidence, to determine if substantial evidence exists.  In this case, there is substantial evidence to support the ALJ, and the ALJ should therefore be affirmed.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: June 15, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE